# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

**LOWANA SHANELL DUMAS**
2615 Martin L King Avenue
Flint, Michigan 48505
(810) 309-3158

Case: 2:10-cv-12661
Judge: Feikens, John
MJ: Morgan, Virginia M
Filed: 07-06-2010 At 09:01 AM
IFP Lowana Dumas v. Hurley Medical Center, et : al (dw)

Plaintiff, *In propria persona*

*Versus*

**HURLEY MEDICAL CENTER, et.al**
One Hurley Plaza
Flint, Michigan 48503
(810) 257-9731

Defendants, *no known attorneys*

*[list attached]*

# CIVIL COMPLAINT

## COMPLETE LIST OF KNOWN DEFENDANTS[1]

**DEFENDANT NO.: 1.**   **HURLEY MEDICAL CENTER**
A government owned and funded, teaching medical organization which is authorized to practice in Genesee, Shiawassee, and Lapeer counties of Michigan.

**DEFENDANT NO.: 2.**   **CITY OF FLINT**
The municipality which owns / operates Hurley Medical Center.

**DEFENDANT NO.: 3.**   **AFSCME LOCAL 1603**
An organized union which functions within Hurley Medical Center to represent interest of its members.

**DEFENDANT NO.: 4.**   **AFSCME COUNCIL 25**
An organization which provides legal counsel and representation for local 1603 members.

**DEFENDANT NO.: 5.**   **DAVID SCZEPANSKI, HURLEY MEDICAL CENTER LABOR RELATIONS DIRECTOR**
In professional and individual capacity

**DEFENDANT NO.: 6.**   **VANESSA NELSON, HURLEY MEDICAL CENTER SENIOR LABOR RELATIONS ANALYST**
In professional and individual capacity

**DEFENDANT NO.: 7.**   **JAY C. KITSON, HURLEY MEDICAL CENTER VICE PRESIDENT HUMAN RESOURCES**
In professional and individual capacity

**DEFENDANT NO.: 8.**   **DWAYNE PARKER, HURLEY MEDICAL CENTER EQUITY & CULTURAL DIVERSITY DIRECTOR**
In professional and individual capacity

**DEFENDANT NO.: 9.**   **DELORIS LOTS, LOCAL 1603 PRESIDENT**
In professional and individual capacity

**DEFENDANT NO.: 10.**   **PATRICIA RAMIREZ, LOCAL 1603 BARGAINING CHAIRPERSON**
In professional and individual capacity

**DEFENDANT NO.: 11.**   **SHEILA MOORE, HURLEY MEDICAL CENTER LABORATORY HEAD SUPERVISOR**
In professional and individual capacity

**DEFENDANT NO.: 12.**   **KRISTEN DELONEY, HURLEY MEDICAL CENTER LABORATORY SUPERVISOR**
In professional and individual capacity

---

[1] Plaintiff does not waive the right to pursue any claims against any parties which are unknown and/or concealed at the time of this filing and by this statement preserves said right.

In professional and individual capacity

**DEFENDANT NO.: 13. <u>MARLENA MILLER, HURLEY MEDICAL CENTER LABORATORY CLERK</u>**
In professional and individual capacity

**DEFENDANT NO.: 14. <u>JANICE ANDERSON, HURLEY MEDICAL CENTER LABORATORY CLERK</u>**
In professional and individual capacity

**DEFENDANT NO.: 15. <u>CARLA [LAST NAME UNKNOWN], HURLEY MEDICAL CENTER LABORATORY
CLERK</u>**
In professional and individual capacity

**DEFENDANT NO.: 16. <u>JAVONKA [LAST NAME UNKNOWN], HURLEY MEDICAL CENTER LABORATORY
CLERK</u>**
In professional and individual capacity

**DEFENDANT NO.: 17. <u>EMILY [LAST NAME UNKNOWN], HURLEY MEDICAL CENTER MEDICAL
TECHNOLOGIST</u>**
In professional and individual capacity

**DEFENDANT NO.: 18. <u>BRANDY MARSH, HURLEY MEDICAL CENTER LABORATORY CLERK</u>**
In professional and individual capacity

---

## CONTACT INFORMATION & ADDRESSES OF SERVICE [2]

**DEFENDANT NO.: 1.  <u>HURLEY MEDICAL CENTER</u> [810-257-9000]**
ATTN. William Smith, Vice President Legal Affairs
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 2.  <u>CITY OF FLINT</u> [810-766-7146]**
ATTN. Peter Bade, City Attorney
1101 South Saginaw Street; Flint, Michigan 48502

**DEFENDANT NO.: 3.  <u>AFSCME LOCAL 1603</u> [810-262-9681]**
ATTN: AFSCME Local 1603
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 4.  <u>AFSCME COUNCIL 25</u> [810-787-5381]**
ATTN: Albert Garrett, President
G-4101 Clio Road; Flint, Michigan 48504

**DEFENDANT NO.: 5.  <u>DAVID SZCZEPANSKI</u> [810-262-9494]**
ATTN: Labor Relations Department
1 Hurley Plaza; Flint, Michigan 48503

---

[2] Service may be by mail, in-person, or by any other means authorized by F.R.C.P. Rule 4.

**DEFENDANT NO.: 6.** **VANESSA NELSON** [810-257-9000]
ATTN: Labor Relations Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 7.** **JAY C. KITSON** [810-257-9672] .
ATTN: Human Resources Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 8.** **DWAYNE PARKER** [810-257-9886]
ATTN: Personnel Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 9.** **DELORIS LOTS** [810-262-9681].
ATTN: AFSCME Local 1603
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 10.** **PATRICIA RAMIREZ** [810-262-9681]
ATTN: AFSCME Local 1603
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 11.** **SHEILA MOORE** [810-257-9130]
ATTN: Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 12.** **KRISTEN DELONEY** [810-257-9130]
C/O: SHEILA MOORE, Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 13.** **MARLENA MILLER** [810-257-9130]
C/O: SHEILA MOORE, Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 14.** **JANICE ANDERSON** [810-257-9130]
C/O: SHEILA MOORE, Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 15.** **CARLA [LAST NAME UNKNOWN]** [810-257-9130]
C/O: SHEILA MOORE, Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 16.** **JAVONKA [LAST NAME UNKNOWN]** [810-257-9130]
C/O: SHEILA MOORE, Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 17.** **EMILY [LAST NAME UNKNOWN]** [810-257-9130]
C/O: SHEILA MOORE, Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

**DEFENDANT NO.: 18. <u>BRANDY MARSH,</u> [810-257-9130]**
C/O: SHEILA MOORE, Laboratory Services Department
1 Hurley Plaza; Flint, Michigan 48503

## STATEMENT OF CITIZENSHIP

1. Plaintiff is a resident of the State of Michigan and a lawful citizen of the United States of America. Named Defendants No. 1 - No. 4: AFSCME Council 25, AFSCME Local 1603, City Of Flint, and Hurley Medical Center are lawful government municipalities, organizations, or incorporations whose principle place of business is in the State of Michigan.

2. Named Defendants no.5 - no.18: David Szczepanski, Vanessa Nelson, Jay C. Kitson, Dwayne Parker, Deloris Lots, Patricia Ramirez, Sheila Moore, Kristen Deloney, Marlena Miller, Janice Anderson, Carla [Last Name Unknown], Javonka [Last Name Unknown], Emily [Last Name Unknown], and Brandy Marsh are residents of the State of Michigan and lawful citizens of the United States of America.

## STATEMENT OF JURISDICTION

This labor case does involve federal statutes, including the United States Constitution and Amendments thereto; 5 USC §5596; 18 USC §241; 18 USC §242; 18 USC §245; 21 USC §141; 29 USC §158; 42 USC §1201; 42 USC §1983; & 42 USC §2000. Therefore, JURISDICTION IS PROPER in this honorable court.

## STATEMENT OF VENUE

As there is currently no judge appointed to the Federal District Court located in Flint, Michigan VENUE IS ALSO PROPER in this honorable court.

## KNOWN CAUSES OF ACTION[3] (categorized[4])

### BREACH (12 counts)

**COUNT 1::**    Breach of Implied Contract for Employment

**COUNT 2::**    Breach of Express Contract for Employment

**COUNT 3::**    Breach of Guarantee/ Warranty of Employment

**COUNT 4::**    Breach of Implied Covenant of Good Faith and Fair Dealing

**COUNT 5::**    Breach of Express Covenant of Good Faith and Fair Dealing

**COUNT 6::**    Breach of Performance Contract for Employment

**COUNT 7::**    Breach of Satisfaction Contract for Employment

**COUNT 8::**    Breach of Verbal Contract for Employment

**COUNT 9::**    Induced Breach of Contract for Employment

**COUNT 10::**    Negligent Breach of Contract for Employment

**COUNT 11::**    Breach of Fiduciary Duties

**COUNT 12::**    Breach of Trust

### TERMINATION (3 counts)

**COUNT 13::**    Retaliatory Discharge

**COUNT 14::**    Constructive Discharge

**COUNT 15::**    Wrongful Discharge

---

[3] Plaintiff does not waive the right to pursue any claims which are unknown and/or concealed at the time of this filing and by this statement preserves said right.

[4] Plaintiff has attempted to sort the list of causes of action into categories for ease of reading. This in no way implies or intends that the causes of action may be minimized into the number of categories; but only demonstrates that Plaintiff has excellent organizational skills.

## FRAUD (16 counts)

COUNT 16::    Abuse of Privilege

COUNT 17::    Disparagement of Goods & Slander of Title

COUNT 18::    Business Defamation

COUNT 19::    Defamation of Character

COUNT 20::    Malicious Publication of Fraudulent Material Misrepresentations

COUNT 21::    Negligent Publication of Fraudulent Material Misrepresentations

COUNT 22::    Nondisclosure

COUNT 23::    Fraud

COUNT 24::    Silent Fraud

COUNT 25::    Innocent Misrepresentation

COUNT 26::    Fraudulent Misrepresentation

COUNT 27::    Unilateral Changes of Written Policies and Verbal Contracts

COUNT 28::    Featherbedding

COUNT 29::    Promissory Estoppel

COUNT 30::    Unconscionability

COUNT 31::    Unfair Labor Practices in Violation of Public Policy

## INVASION (7 counts)

COUNT 32::    Invasion of Privacy

COUNT 33::    Invasion of Privacy Through Tortious Interference with Penumbra of Privacy Guaranteed by the United States Constitution

COUNT 34::    Invasion of Privacy Through Public Disclosure of Private Facts Concerning Plaintiff

**COUNT 35::**  Invasion of Privacy Through Intra-corporate Disclosure of Private Facts Concerning Plaintiff

**COUNT 36::**  Invasion of Privacy Through Inter-corporate Disclosure of Private Facts Concerning Plaintiff

**COUNT 37::**  Invasion of Privacy Through Malicious Construction of False Light

**COUNT 38::**  Invasion of Privacy Through Intrusion Into Seclusion

## NEGLIGENCE (5 counts)

**COUNT 39::**  Negligent Infliction of Loss of Society

**COUNT 40::**  Negligence

**COUNT 41::**  Gross Negligence

**COUNT 42::**  Negligent Supervision

**COUNT 43::**  Creation, Encouragement and Sustainment of a Hostile Work Environment

## INTERFERENCE (9 counts)

**COUNT 44::**  Interference with Federally Protected Activities

**COUNT 45::**  Tortious Interference with Existing Contract for Employment

**COUNT 46::**  Tortious Interference with Existing Business Relations and Economic Advantage

**COUNT 47::**  Tortious Interference with Existing  Advantageous Business Relationship

**COUNT 48::**  Tortious Interference with Potential Business Relationship/Expectancy Thereof

**COUNT 49::**  Tortious Interference with Potential Economic Advantage

**COUNT 50::**  Tortious Interference with Right to Due Process

**COUNT 51::**    Tortious Interference With Right To Confidentiality

**COUNT 52::**    Tortious Interference With Right To Due Process

## DISCRIMINATION (16 counts)

**COUNT 53::**    Discrimination animus

**COUNT 54::**    Color of Eye Discrimination

**COUNT 55::**    Color of Skin Discrimination per Civil Rights Act

**COUNT 56::**    Ethinic Intimidation per Michigan Ethnic Intimidation Act

**COUNT 57::**    Ethnicity Discrimination per Civil Rights Act

**COUNT 58::**    Ethnicity Discrimination per Michigan Ethnic Intimidation Act

**COUNT 59::**    Gender Discrimination per Civil Rights Act

**COUNT 60::**    Genetic Discrimination per Title II of the Genetic Information Nondiscrimination Act

**COUNT 61::**    Marital Status Discrimination per Elliot-Larsen Civil Rights Act

**COUNT 62::**    Maternal Status Discrimination per Elliot-Larsen Civil Rights Act

**COUNT 63::**    Maternal Status Discrimination per Americans with Disabilities Act

**COUNT 64::**    Race Discrimination per Civil Rights Act

**COUNT 65::**    Weight Discrimination per Elliot Larsen Civil Rights Act

**COUNT 66::**    Disability Discrimination per Americans With Disabilities Act

**COUNT 67::**    Disparate Treatment per Title VII

**COUNT 68::**    Disparate Impact per Title VII

## ADDITIONAL (21 counts)

**COUNT 69::**    Civil Conspiracy

**COUNT 70::**    Malice

**COUNT 71::**    <u>Hazing</u>

**COUNT 72::**    <u>Sabotage</u>

**COUNT 73::**    <u>Coercion</u>

**COUNT 74::**    <u>Harassment</u>

**COUNT 75::**    <u>Oppression</u>

**COUNT 76::**    <u>Retaliation</u>

**COUNT 77::**    <u>Segregation</u>

**COUNT 78::**    <u>Concert of Action</u>

**COUNT 79::**    <u>Intentional Infliction of Emotional Distress and Mental Anguish</u>

**COUNT 80::**    <u>Negligent Infliction of Emotional Distress and Mental Anguish</u>

**COUNT 81::**    <u>Conspiracy Against Rights</u>

**COUNT 82::**    <u>Active Concealment</u>

**COUNT 83::**    <u>Deprivation of Liberty Interests</u>

**COUNT 84::**    <u>Discipline for Union Activity</u>

**COUNT 85::**    <u>Violation Of National Labor Relations Act</u>

**COUNT 86::**    <u>Violation Of Labor Management Reporting And Disclosure Act</u>

**COUNT 87::**    <u>Violation of Whistleblower Protection Act</u>

**COUNT 88::**    <u>Deprivation Of Rights Under Color Of Law</u>

**COUNT 89::**    <u>Constitutional  Challenge to AFSCME, LOCAL 1603, Hurley Medical Center, & City of Flint Policies In Re Probationary Employees Which Allow Violation of Civil Liberties & Civil Rights</u>

## COMPLAINT & DEMAND FOR RELIEF

1.  PLAINTIFF applied for employment with Hurley Medical Center for the advertised position of Laboratory Clerk. One position was advertised as available in the Flint Journal Employment Classifieds Section.

2.  PLAINTIFF successfully completed all testing and ranked high enough to be in the running for attainment of the position provided the interview, drug test, and reference check came back successful.

3.  PLAINTIFF successfully completed the reference check.

4.  PLAINTIFF successfully completed the drug test.

5.  PLAINTIFF successfully completed an interview process that included physical examination and face-to-face questioning from Supervisor Kristen DeLoney (second/third shift supervisor) and [Name unknown] (first shift supervisor).

6.  PLAINTIFF provided full disclosure during the interview process that she had never previously worked in a medical laboratory, but had medical experience from over ten years of providing home care to her Grandmother and serving as a medical services apprentice in the United States Air National Guard (Michigan).

7.  PLAINTIFF received assurance that there would be time provided to learn the position and co-workers to "help" plaintiff as the functions of the position were learned.

8.  PLAINTIFF provided full disclosure during the interview process of mental health conditions, SPECIFICALLY anxiety, depression, and post-traumatic stress disorder, which significantly impair one or

more major life functions AND that an accommodation may become necessary in the future.

9.    PLAINTIFF received confirmation of complete understanding from Supervisor DeLoney of the physical and psychological effects of anxiety, depression, and post-traumatic stress disorders which had manifested during previous employment, such as intense shaking, jerking, inability to catch breath, panic attacks, inability to function (cognitive, emotional, physical), & severe stress.

10.   PLAINTIFF provided full disclosure of what actions of former employer precipitated the physical and psychological effects of the anxiety, depression, and post-traumatic stress disorders.

11.   PLAINTIFF received confirmation of complete understanding from Supervisor DeLoney of what actions would trigger the physical and psychological effects of the anxiety, depression, and post-traumatic stress disorders.

12.   PLAINTIFF provided full disclosure during the interview process of physical health conditions, SPECIFICALLY dysmennohrea, fibroid tumors, and a severe reaction to dairy products which is greater than that which can ordinarily be expected from lactose intolerance; that all of these significantly impair one or more major life functions for plaintiff; AND that an accommodation would be necessary because of the severity of the physical health conditions.

13.   PLAINTIFF received confirmation of complete understanding from Supervisor DeLoney of the limitations which could be imposed by and through the physical health conditions of dysmennohrea, fibroid tumors, and a severe reaction to dairy products which included excessive flatus; excessive vaginal bleeding not consistent with, but

PAGE 12

in addition to menses; inability to walk, sit, or stand; severe nausea and vomiting; inability to provide physical assistance to self (need for assistance with utilization of restroom, medication administration).

14.   PLAINTIFF received assurance from Supervisor DeLoney that provided *"a telephone call is received prior to the beginning of assigned shift, there will be no problem; nothing to worry about because if you can't walk, then you can't walk. I wouldn't expect you to."* Per Supervisor DeLoney, *"notice"* was the only requirement when someone is unable to come in to work that day".

15.   PLAINTIFF received no formal training and was placed on the job immediately to *"learn while doing"* as, per Supervisor DeLoney, *"it's the only way to understand the job".*

16.   PLAINTIFF was notified by Supervisor DeLoney that there was *"no real procedure on how to do the job and she* [DeLoney] *had no real way to train someone to do the job".*

17.   PLAINTIFF was SPECIFICALLY DIRECTED by Supervisor DeLoney to *"...take chances and <u>make as many mistakes as you can</u> so that you can learn during this time...because after you have been here for a year, I can't say 'Oh, well, she's new, so she couldn't have known that this was how you do that.' You are new right now; you're expected to make mistakes. Don't feel bad about it. I have girls out there who are making mistakes and they've been here a lot longer than you – you just started! Every day I come in and have mistakes to correct and they've been here for many years. If I get you to learn the job the correct way from the beginning, then you won't be making those stupid mistakes like the others when you've been here for five and ten years. I need you to try to make mistakes so that I can show*

*you why it was wrong and you can learn the process."* Although directly instructed to perform substandard work, plaintiff was incapable of making deliberate mistakes because it is a direct contradiction to plaintiff's work ethic and morals.

18.   PLAINTIFF partook in daily follow-up discussions with Supervisor DeLoney about plaintiff's overall satisfaction with the job requirements and Supervisor DeLoney's satisfaction with plaintiff's job performance.

19.   PLAINTIFF received daily assurances during these follow-up discussions of employment continuation from Supervisor DeLoney that were contingent upon Plaintiff desiring to retain the position.

20.   PLAINTIFF received daily assurances during these follow-up discussions of employment continuation from Supervisor DeLoney that were contingent upon plaintiff continuing to provide the quality of work.

21.   PLAINTIFF received daily during these follow-up discussions verbal progress reports wherein she was told of Supervisor DeLoney's favorable satisfaction with the quality of plaintiff's work, plaintiff's progress in learning the computer systems, and plaintiff's progress in learning the various laboratory intra-departments (stations).

22.   PLAINTIFF received notice from Supervisor DeLoney that she [DeLoney] was so satisfied with plaintiff's progress and workmanship that plaintiff would be working at the front of the Laboratory Services Department the following day where she would be responsible for telephone and window reception services as well as checking laboratory slips for accuracy of data entry by the other Laboratory Clerks.

23. Plaintiff was directed by Supervisor DeLoney to ask the other Laboratory Clerks if she was unsure about something. She was further directed to return any incorrect Laboratory slips to the Laboratory Clerk who entered the information in the system so that he or she could make the corrections.

24. PLAINTIFF was told by Supervisor DeLoney the following day that there were *"concerns brought to [her] attention about [plaintiff] working up front"*. As the conversation progressed, Supervisor DeLoney disclosed that the *"concerns"* were actually *"complaints from the other Laboratory Clerks"* who indicated to her that plaintiff *"should not be allowed to work up front as they 'slave away' in the back of the department."* Supervisor DeLoney went on to state that *"the other girls don't think you're ready to work up front, so I'm not going to allow you to."*

25. PLAINTIFF was then told by MaryAnn that the other Laboratory Clerks had made up their minds about me based upon my name and how I looked. They were in regular conference with Supervisor DeLoney demanding that I be fired. Specifically, Kristen's favorite employee, Marlena Miller had repeatedly asked for my termination. Confirmations of Miller's efforts were confirmed by other workers as well.

26. PLAINTIFF confided in Tamara Green, who was hired the same date and for the same position as plaintiff, although there was only one position available about harassing behavior from the other employees. On advice from Green, plaintiff took the concerns to Supervisor DeLoney.

27. PLAINTIFF discussed at great length and in great detail the harassment which she received from co-workers, which included racial slurs of "house nigger" from African American co-workers, sabotage of work by and through such incidences as removing specimens from plaintiff's workstation and depositing them in the garbage, & an aggressive, hostile demeanor toward plaintiff.

28. PLAINTIFF was SPECIFICALLY told by Supervisor DeLoney that "the other girls are jealous because [her] skin is such a pretty color, [her] eyes are so beautiful, [her] hair is so long, [she] is so thin, [she] doesn't have any children or a husband to take up her time." And was instructed to "give them time to warm up to [her]."

29. PLAINTIFF was asked and provided the names of the individuals who were the main instigators of conflict for plaintiff.

30. PLAINTIFF disclosed during this meeting that the situation with co-workers had elevated to the point of requiring an accommodation for anxiety. Supervisor DeLoney stated that she would speak to the individuals and notify them the behavior was unacceptable, so "not to worry about it, an accommodation won't be necessary."

31. PLAINTIFF received notice of her medical conditions being common knowledge throughout the laboratory when her coworkers began asking about them. It was disclosed to plaintiff that Supervisor DeLoney had disclosed the details of her confidential medical information to coworkers who in-turn utilized it to further torment plaintiff.

32. PLAINTIFF followed up with Supervisor DeLoney about the harassment and was told that "they do this to every new girl I hire. It's just how they are; how things work in here. Ride it out."

33.   PLAINTIFF endured additional harassment wherein she was told by coworkers that she "smell[s] like shit", "[is] too light to be black", "smell[s] like old cheese" and went to speak with Dwayne Parker, the EEO officer at Hurley Medical Center.

34.   PLAINTIFF disclosed all information to Mr. Dwayne Parker and was told he would investigate the matter within two weeks time. Mr. Parker being African American and the offenders being African American, failed to honor his obligation and DID NOT investigate the matter.

35.   PLAINTIFF last spoke with Mr. Parker after the Michigan Department of Civil Rights had become involved. Plaintiff was terminated from employment November 30, 2007. Mr. Parker disclosed to plaintiff that he had "not gotten around to investigating [her] claim [of harassment and disparate treatment] yet" in February 2009.

36.   PLAINTIFF received notice from the CRD investigator that Mr. Parker failed to return phone calls in re the state investigation which sought discovery of his investigative notes.

37.   PLAINTIFF received no negative feedback from Supervisor DeLoney UNTIL she asked to file a grievance about the harassment that she was receiving from co-workers. When it became obvious that Supervisor DeLoney was not going to address the situation, plaintiff felt this was her only option.

38.   PLAINTIFF  was SPECIFICALLY told by Supervisor DeLoney that "because she had indicated intent to file a grievance with the union (Local 1603) and contact the EEOC,  things [were] not going to be easy for plaintiff." Supervisor DeLoney indicated that she considered this to be a violation of trust with her and thereby inappropriate.

39. PLAINTIFF at that time began to receive retaliatory treatment from Supervisor DeLoney which included a combative, dismissive conversation style; mockery in re plaintiff's harassment concerns, mockery in re physical manifestations of plaintiff's health conditions, including mocking plaintiff's request to not work on December 17, which is the day plaintiff's Grandmother died at Hurley Medical Center.

40. PLAINTIFF detrimentally relied upon the promises of Supervisor Deloney which SPECIFICALLY guaranteed employment continuation.

41. PLAINTIFF endured immense harassment from the laboratory services department from, by and through the named defendants to the point of psychological damage.

42. PLAINTIFF applied for unemployment benefits with the State of Michigan and was DENIED because it was the position of Hurley Medical Center that plaintiff had "voluntarily quit" the position. Irrespective of challenge which plaintiff herein lays, plaintiff was terminated by Hurley Medical Center.

43. PLAINTIFF was notified that Hurley Medical Center challenged plaintiff's ability to collect unemployment for being a "voluntary quit" who "violated work policies". Plaintiff provided a 23-page response to that challenge and was denied benefits and incorporates that document into this complaint. [see attached]

44. PLAINTIFF appealed to the board of review, received a second consideration and was denied the opportunity to be heard on the matter for lack of timeliness in protesting by Judge Dahlquist.

45. PLAINTIFF faced David Sczepanksi, Sheila Moore, and Kristen DeLoney at that hearing - all of whom presented to offer testimony against

plaintiff being allowed to receive benefits she was rightfully entitled to.

46. PLAINTIFF appealed to the board of review and was returned to Judge Dahlquist to be heard on the merit of the claim with dismissal to the lack of timeliness issue.

47. PLAINTIFF gave testimony to Judge Dahlquist about the conditions of employment, the harassment, the failure of supervisory staff to address the known issue and the termination.

48. PLAINTIFF faced Vanessa Nelson at this hearing. Ms. Nelson admitted to the court that Hurley Medical Center had provided inaccurate information to the Unemployment Agency in order to prevent plaintiff from being able to receive unemployment benefits.

49. PLAINTIFF received a favorable verdict when Judge Dahlquist found that Hurley Medical Center had violated its own policy of not following a progressive disciplinary system without cause and had subjected plaintiff to unconscionable behavior.

50. PLAINTIFF has to date received none of the unemployment funding which was due per Judge Dahlquist's order.

51. PLAINTIFF received no assistance from Local 1603, who although receiving dues, refused to help plaintiff. Plaintiff was SPECIFICALLY instructed by Patricia Ramirez to "do your time"; you have to be hazed, like a fraternity or sorority.

52. PLAINTIFF had requested assistance from Local 1603 as far back as August and received none. Upon the unsupervised determination of Patricia Ramirez, the grievance which plaintiff desired to file was never articulated. Plaintiff was instructed to "sit tight and see what happens next."

53.   PLAINTIFF was "next" terminated.

54.   PLAINTIFF finally received a grievance filing AFTER she was terminated. Hurley Medical Center stood by the termination and the grievance was sent to Council 25 for review to determine if they would be willing to arbitrate on Plaintiff's behalf.

55.   PLAINTIFF was told by Council 25 after months of pursuing them that there is so much leeway with employers for probationary employees that there would be no reason to attempt arbitration.

56.   PLAINTIFF has discovered that Council 25 will only represent you if you have committed fraud, theft, drank on the job, slept on the job, endangered others, and other comparable immoral behavior. Generally, they would have represented the racist co-workers rather than plaintiff. This is per the AFSCME website where preserving employment for these kinds of people is proclamated as a victory! Of immorality, yes; of anything worthwhile - no.

Due to the outrageous conduct of supervisory staff, laboratory clerks, and laboratory medical technicians; the failure to provide adequate supervision of the laboratory functioning by Hurley Medical Center and the City of Flint; the continuous, malignant efforts to deprive plaintiff of dignity and civil liberty, plaintiff seeks damages in the amount of $7,500,000.

Dated: _July 4, 2010_   By:_Javana S Dumas_

# LOWANA SHANELL DUMAS

*362785692*

## RESPONSE TO FACT-FINDING FORM

*fired – violation of policy*

# EMPLOYER NAME: <u>HURLEY MEDICAL CENTER</u>

## 1. <u>ON WHAT DATE WERE YOU FIRED?</u>

*I was suspended pending permission to terminate on November 30, 2007 and was sent a notice of termination effective December 19, 2007.*

## 2. <u>WHO FIRED YOU? GIVE NAME AND TITLE.</u>

*I was fired by Kristen Deloney; she is one of the supervisors of the laboratory department.*

## 3. <u>ON WHAT DATE DID THE INCIDENT OCCUR WHICH CAUSED YOU TO BE FIRED?</u>

*I received discriminatory treatment from the day I began employment with Hurley Medical Center until the day I was fired, including being mocked because I am a multi-racial person and being repeatedly called a "house-nigger" by the darker-skinned blacks employed there. My skin tone is very light, a golden-tan (I am often mistaken for Caucasian because I look like I am and have a tan); my eyes are grey, but change to blue and green.*

*At the onset of my employment with the Laboratory Department it was determinable that there was a set of workers within the department who formed a group of close-knit friends (all female), commonly referenced within the department and within the hospital as a "clique". Members of this group indicated a dislike for me from day one through such means as looking me up and down and rolling her eyes, scowling at me, and behaving toward me in other discourteous, rude, demeaning, and humiliating ways. I accepted this as "newcomer syndrome" wherein the seasoned workers in a department are unkind toward the new workers (it's not uncommon), and considered that it would likely pass within a few weeks. Supervisor Deloney also indicated that would be the only reason for the conduct and said to "just let them warm up to you".*

*However, as the weeks continued, I met with several complaints from co-workers and Supervisor Deloney, specifically in regard to properly ordering the ORGLU tests, such as when it is and is not appropriate. Supervisor Deloney provided almost daily assurance that my progress was right on target for a person who has <u>not had experience</u> in a medical laboratory previous to this position and was told, in fact, that I had learned so*

46
48
50

*well and so quickly that she was going to place me in Customer Service – she "was sure I could handle it" - where I would be responsible for answering the phones, retrieving the lab results and checking the Outreach slips for correct information and correct tests ordered in accessioning. She felt that because of my Associates Degree in Administrative Assisting, I would have no problem holding down the "office" aspect of the department.*

52
54
56
58
60
62

*The day following my assignment to customer service, Supervisor Deloney notified me personally that I "would not be allowed to work in Customer Service again because my co-workers...", specifically those in the clique "...did not feel I had been in the department long enough to work in Customer Service and felt I should work longer in the back of the lab before being allowed to work in Customer Service". She stated that they "felt if anyone should be in the office, it should be one of them because they have been here longer." Supervisor Deloney stated that she regularly referenced the other accessioners on how the new hires (2) were doing in the lab to make her determinations on our respective progress, and she (Supervisor Deloney) had made a mistake to place me in Customer Service, "It was (her) fault" and "She should have checked with the other accessioners to see how (I) was doing and what they thought of it before putting me in there".*

64
66
68
70
72
74
76

*Following my day in Customer Service, it became common knowledge in the laboratory that Marlena (Supervisor Deloney's best friend) had stated that I smelled up the office and stunk when I stood near her to ask a question about a test. Marlena took to spraying large quantities of the laboratory industrial-strength cleaner when I was in the Customer Service office and she was required to be in there as well, such as when I was charting. I consider this demeaning and harassing. Although I was concerned at that time about co-workers, especially those who indicate a predisposition against me being allowed to determine my job responsibilities, I voiced no concerns to Supervisor Deloney at that time. However, my concerns became elevated when I began receiving numerous complaints from Supervisor Deloney regarding minute things that were, as she –at that time- stated were "things to be learned in the process of learning the position", because she "had no real procedure on how to do the job".*

78
80
82
84

*These things included ordering the proper test by confirming with one of the seasoned workers prior to ordering whenever I was unsure of which test was being requested. That was the largest hurdle for me, as I have an American's with Disabilities Act covered mental impairment which significantly impacts my ability to interact with others, causing me to be shy and withdrawn; however, I made the effort and received assistance from Turkessa, Vikki, Elizabeth, and Javonka without incident. On the other hand, when they were not available and I was left to ask of other persons, I was met with rudeness and treated in a manner consistent with one who is simply not welcome.*

86
88

*This behavior was especially pronounced with Janice, Marlena, and Brandy. (Although clearly disliked by Carla – her disdain was so visibly pronounced that I never even ventured to ask her a question – which is to my credit because she is the person who*

missed the 5 tests on one person's sheet mentioned earlier!). In fact, Brandy began rudely yelling things out so loudly you would have thought either she had Tourette's Syndrome or I was standing on the other side of the room. Nevertheless, Supervisor Deloney continued to berate me regarding these things that I was to, per her, "learn on-the-job" while simultaneously proclaiming that I was "doing a great job" and to "not worry about it; it's a lot to remember".

Upon notification of the discriminatory conduct I was receiving was provided to Supervisor Deloney, I was constructively terminated.

## 4. HOW DID YOU ALLEGEDLY VIOLATE COMPANY POLICY?

Company policy mandates that if you are receiving discriminatory behavior from personnel who have been there longer than you, you are to say nothing and accept the treatment.

I cannot testify to the exact date at this time; however, I was called into the office of Supervisor Deloney and was told that we are required to register a certain amount of people per hour, per day and my numbers were too low. Supervisor Deloney indicated at that time that my employment was in the balance of having the same amount of registrations as the accessioning staff that sits at tube station ID# 111. Neither during the interview, in the job description, nor in the days subsequent to my start date was I made aware that there were a certain number of registrations and accessions we were required to do in the lab. I am not sure how that number would even begin to be calculated given that it is impossible to determine how many specimens will come into the laboratory each day.

One of the accommodations required for my mental impairment is that I am in a non-competitive environment. Supervisor Deloney was made aware of this at the interview and during this meeting. In fact, I told her during this meeting that if she required an accommodation request be in writing, I would be able to get that for her; however, she stated "it was not necessary; to do as many as I can- just for the experience of working in that particular program." Additionally, Hurley Medical Center was made aware of the accommodations required due to my impairment and was provided a copy of a psychological exam which indicates the accommodations required.

Nevertheless, Supervisor Deloney continued to machinate a constructive termination by making regular occurrences for other accessioners unavailable and prohibited to me. For example, she indicated that the day previous to our conversation she had witnessed me open up a Flint Journal newspaper in the laboratory and read it while others were working and the other accessioning staff (specifically those who are in the clique – who sit at tube station ID#111) had an issue with it and complained to her about it. I explained to her that I had finished my specimens and there were no others available for me to acquire, to which she responded, "Yeah, I know, but it looked bad".

134   *When I began employment in the lab, Supervisor Deloney specifically stated there would*
      *be times when there was nothing to do and I could read something during those "down-*
136   *times" if I wanted to, including the Flint Journal (she specifically named or some of the*
      *magazines from the break/lunch room). Additionally, it is not uncommon for the*
138   *accessioning staff at tube station ID#111 to open up a Flint Journal and make shopping*
      *lists (it has been seen many times before). Nevertheless, there was only an issue about*
140   *reading a Flint Journal in the laboratory when I did it.*

142   *The same applies to the internet; I regularly utilized the online (intranet) directory to*
      *obtain physician information and departmental phone numbers; however, I was told by*
144   *Supervisor Deloney that she had received a complaint from other accessioners that I had*
      *been online. I informed her that I was using the directory, which she was surprised to*
146   *find out was there, and stated that this use was fine; she thought I was merely surfing*
      *the internet with work to be done. Although I have seen other (clique) accessioners*
148   *browsing through catalogues and completing orders online, it was not something I*
      *partook in. Supervisor Deloney previously indicated to me that in down-times it is also*
150   *acceptable to utilize the Internet service that the hospital provides for personal*
      *entertainment. Nevertheless, once again there was only an issue when I was involved.*
152   *When I partake in these things that (I was told) are commonplace and acceptable*
      *behaviors, there is a controversial issue that needs to be addressed. I have been treated*
154   *differently since my employment began and the behavior has only escalated – as you see ::*
      *I have been fired.*

156
      *When Supervisor Deloney indicated to me that my job was on the line of registration*
158   *numbers, I indicated to her that the tube system is mostly what I focus on, per her orders*
      *to do so, and I was receiving no assistance from the other accessioning staff in those*
160   *duties which would allow me to also complete mass amounts of registrations. At tube*
      *station ID# 202 (where I sit) we had implemented a system wherein Turkessa and Vikki*
162   *would register the patients and I would maintain the tube system and occasionally order*
      *some of the patients they had registered. As such, my numbers could not possibly match*
164   *those of the accessioners at tube station ID#111 because that tube received 1 incoming*
      *tube for every 10-15 of tube station ID#202. At that time, Supervisor Deloney laughed*
166   *and stated, "Yeah, I know; it's always busy down where you are and those guys down at*
      *the other end won't come and help you – I know". Then she indicated I was to do as many*
168   *as I could because my numbers needed to be up there with the accessioners who were not*
      *accessioning in-house specimens, such as I was. Supervisor Deloney had previously given*
170   *me a checklist indicating order of priority for specimens and indicated that in-house was*
      *higher priority than Outreach (which are the specimens being registered).*
172
      *I discussed the matter with persons inside the laboratory and with persons outside the*
174   *laboratory and determined that I would write a letter to Supervisor Deloney indicating*
      *that I wanted to initiate the grievance procedure through Local 1603 because I felt I was*
176   *being singled out for reasons, including being asked to do twice as much work as the*

*other accessioners. Supervisor Deloney indicated that she was taking the letter to Human Resources/ Personnel to have it determined if I should be fired for writing it.*

178
180

*The union representative encouraged me to go and speak with Supervisor Deloney one-on-one to prevent her from trying to fire me for writing the letter and I did so. Supervisor Deloney was specifically told of the manner in which I was being treated by the [clique] accessioners and that I was being treated differently and want the behavior stopped. She indicated that previous to that time she was not aware of any problems with the working relationship between myself and the other accessioners and asked for names of the persons who were treating me in such a demoted, degrading manner; they were provided. From that time, on; however, Supervisor Deloney partook in the behavior that was the cause of concern from my co-workers, making my working hours uncomfortable and making broad changes to only me that were making it difficult for me to work.*

182
184
186
188
190

*Supervisor Deloney served three disciplinary notices on me in one day at the same time. The one that requested permission to terminate my employment, stated that it relied upon a performance review. The performance review indicated that the manner in which I do my job was excellent; however, I failed at "teamwork". As illustrated in the above statements – I was not welcome on the team.*

192
194
196

*I did not violate company policy.*

198

*I was constructively terminated for reporting discrimination to my supervisor.*

200

*Supervisor Deloney, although made aware of the extreme bias being exhibited toward me by other accessioning staff, including those in the Customer Service office, provided an Employee Performance Review on November 30, 2007 which indicates:*

202
204
206

*Teamwork*

*Lowana does not accept or acknowledge the work of others. Lowana makes allegations of sabotage by fellow laboratory clerks and medical technologists. The management staff could not substantiate any claims. Management staff recognizes Lowana of initiating problems with team-based activities.*

208
210
212

*My response*

214

*These statements are inaccurate and untrue rabble constructed merely to justify terminating my employment for reporting discrimination and harassment:*

216



1.  I don't <u>accept the work of others</u>, because it is not my job to do so. The medical
218     technologists accept the work of others, specifically the accessioned specimens. I
        accession; that is my job – and it involves me, with others being involved only as
220     needed. It was explained to me that this was an individual job, not a group effort
        with the specimens I would be responsible for.
222

2.  To indicate that I do not <u>acknowledge the work of others</u>, is recklessly defamatory. I
224     do not follow behind any other employees checking their work; I process the
        specimens I have and route them accordingly. That is my job; it the job of
226     supervisors to monitor other employees. I do my job only – which prevents mistakes
        from attempting to complete tasks out of my range of abilities, such as that done by
228     the medical technologists.

230 3.  I made no <u>allegations of sabotage</u> regarding a medical technologist. I believe
        Supervisor Deloney to be in reference to two (2) incidents wherein specimens were
232     removed from the tube system and thrown away by Brandy Marsh. Irrespective of
        the management staff's failure to "substantiate any claims" by Ms. Marsh
234     providing a full confession, it is my position that the circumstantial basis is valid
        enough to conclude that Brandy Marsh performed according to the behavior she is
236     accused of doing, specifically throwing specimens into the garbage. Ms. Marsh was
        standing at the tube system retrieving specimens on both occasions; neither
238     specimen was received by me; and both specimens were found in the garbage.

240     However, it is common knowledge that Supervisor Deloney is partisan in evaluating
        this claim – she gives inappropriate authority to those whom she has established
242     special relationships with, including Ms. Marsh and Ms. Miller. While a special
        relationship in and of itself is not in violation of any policy, it becomes violative
244     when those special relationships are allowed to impact the employment status of
        other employees at the preference of the special friend..
246

248     Supervisor Deloney without restraint demonstrated a preference for Ms. Marsh to
        the extent of rearranging my schedule, which is in violation of company policies,
        upon the request of Ms. Marsh and repeatedly threatened to drastically shorten
250     my hours if I were to pursue a grievance about such incidents, which is
        retaliation for initiating the enforcement of my rights to file a grievance..
252

254 4.  "Management staff" is clearly accumulating a constructive discharge by indicating
        that I am initiating problems with "team-based activities".

256     It is common knowledge that I stay to myself, am quiet, and do my job with minimal
        errors. The fact that I am not a social butterfly has been a problem for the seasoned
258     accessioners since I began employment. As it happens, I have a mental impairment
        which causes me to be withdrawn and non-social outside of employment-related
260     necessity.



262    *Further, I object to this entire comment as vague and deceptively misleading. The indicator under the "High Performance" of the Teamwork heading indicates:*

264    > *Actively promotes collaboration and strives to achieve team objectives and common goals. Consistently takes on and completes*
266    > *assignments from the team. Acknowledges the contributions of others. Builds trust through communication. Contributes to the*
268    > *success of the team by helping others and seeking help from the appropriate sources to accomplish tasks.*
270

272    *Inasmuch as that is the highest performance described; I accuse management of constructing a discharge. I constantly strive to reach objectives and common goals of the laboratory. Further, if I did not "acknowledge the contributions of others", it is*
274    *needless to say that I would take credit for all the work done in the laboratory; yet I*
276    *have not done so.*

278    *At no time have I belittled, demeaned, or disrespected anyone in the laboratory, but that is what has been done to me on a DAILY basis. I am routinely accused by accessioning and (per management, by the medical technologists) of things I have*
280    *not done.*

282    *The commentary provided by Supervisor Deloney is not merely inaccurate and untrue; it is a calculated, malicious, vicarious lie.*
284

286    *Supervisor Deloney specifically indicated that what I have "accused" my co-workers of doing toward me "cannot be substantiated by management staff"; however what my co-workers have "accused" me of doing management commands that I must have done,*
288    *which is not only unfair, but also biased propaganda indicative of managerial intentions to terminate my employment without justification. Supervisor Deloney stated in the*
290    *meeting wherein I was suspended pending permission to terminate that she felt I was not*
292    *a team player because I "don't fit in" and the other staff don't like me.*

294    *Her disposition that I have failed to adequately "fit in" is restated in writing wherein she pens: "Lowana does not work well with others. Lowana does not acknowledge direction from some of her co-workers." Specifically, Supervisor Deloney is referencing her other*
296    *special friend, Marlena Miller. Supervisor Deloney was made aware that Ms. Miller was the first person to initiate hostile, disrespectful, rude behavior toward me. Ms. Miller is*
298    *not supervisory staff at Hurley Medical Center; however, on numerous occasions she would enter the accessioning area and begin inserting specimens into the work I had*
300    *already set aside for myself – without the authority to assign work to employees. It would have been adequate for the specimens she obtained from the tube system to be set upon the*
302    *table so any accessioner could in-process them instead of literally throwing them into*

304   *what I already had determined I could handle at that time; it was not Ms. Miller's position to interject in my work – she is not employed in that capacity.*

306   *Nevertheless, Ms. Miller routinely violated boundaries of professional and personal*
308   *courtesy. Boundaries which Supervisor Deloney was made aware of and chose to disregard because of the special, personal relationship they share. Ms. Miller also*
310   *routinely used that special relationship with Supervisor Deloney to initiate negative feedback and discipline toward me, a person whom she does not care for (as you recall the*
312   *industrial cleaner episodes mentioned previously). Ms. Miller regularly made it known that when she wants something done, she gets it done through Supervisor Deloney and to*
314   *watch myself carefully. This included being told things that had been said by me in confidentiality to Supervisor Deloney, which she discussed with Ms. Miller and the*
316   *subject matter of which regularly was then dispersed throughout the laboratory and subjected me to ridicule, humiliation, and embarrassment.*

318   *Contrary to Supervisor Deloney's allegations, I normally provide the same courtesy and respect as is shown to me by others. In this case, I provided more than was shown to me.*
320   *The fact is I remained silent most of the time and to myself because the [clique]*
322   *accessioners were so mean that only rudeness could have been returned to them and my parents had the foresight to instill manners. Supervisor Deloney illogically deduces that*
324   *popularity will guarantee a yield of workplace efficiency or quality of contribution to the "team". In fact, only holding up your end of the job and completing the tasks assigned to*
326   *you is what guarantees a yield of workplace efficiency and personal efficacy to the "team". Supervisor Deloney holds me responsible for not "fitting into" the laboratory*
328   *clique; however, that is not a bonafide job qualification, is not in the job description, and is not a valid reason for termination of my employment.*

## 5. **DID YOU RECEIVE ANY VERBAL WARNINGS BEFORE YOU WERE**
330   **FIRED? IF YES, PROVIDE THE DATES AND REASONS FOR WARNINGS**
332   **BELOW.**

334   *No, I did not. I was continually told that I was "doing a great job" and they were "so happy to have [me] on board" and "thanks for all your help" by Supervisor Deloney.*
336   *There was no indication that I was being disciplined for anything until the date of suspension pending permission to terminate. However, the discriminatory and harassing*
338   *conduct worsened and began to include Supervisor Deloney personally after she was notified of the specific problems, which left me with the feeling I was being constructively*
340   *terminated by her.*

342   *Supervisor Deloney began participating in the behavior which caused the concern with my co-workers. Ironically, she specifically did the things I stated the co-workers did – a*
344   *blatant mocking, which included being told, "I'm not singling you out," as a preface to every statement made to me. Her behavior also included:*

346

348

350

🔲 *Supervisor Deloney walked into the laboratory with noone there except me and Tammy (the other new hire). She walked past me and began conversing with Tammy; then looked out the corner of her eye and in an obligatory, irritated tone stated, "Hi, Lowana", continued talking with Tammy and left.*

352

354

356

358

🔲 *Supervisor Deloney walked into the laboratory, saw Brandy and smiled at her; on her way over to Brandy, she saw me standing at the tube system (ID#111) where I was returning surplus tubes, stopped smiling, frowned ( literally furrowed brow), looked away, and sat down next to Brandy. When I passed by her on my way out I leaned toward her, said," Hi, Kristin," and she ignored me; remaining completely silent, rolling her eyes, and turning her head away from me.*

360

362

364

366

🔲 *Supervisor Deloney assigned both new hires to a particular weekend. In general, you can determine which weekend you will be working. When Brandy indicated to Supervisor Deloney that she did not care to work with me on the weekend any longer, Supervisor Deloney removed me from my regular time-slot. Upon inquiry about the change – as it was against company policy - from the Union Representative, Supervisor Deloney stated that if she wants to only work me <u>one day per week</u>, she will do so.*

368

370

372

374

*Following that day, I was called into the office and Supervisor Deloney stated that she was no longer able to assist with things such as switching days – if I needed it to be done, because the Union Representative had complained about it. However, Supervisor Deloney had just approved the switching of a Tuesday for a Wednesday at the request of Tamara (Tammy) Green (the other new hire). Once again, it is only a problem if it is something I am doing, or requesting.*

376

378

380

382

*Notwithstanding all of that, when I walked into the locker room, Brandy was bragging to Elizabeth that she told Supervisor Deloney specifically that she did not want to work the weekend with me and that was the reason my schedule was changed. Per the Union Representative  - who confirmed with the union's Bargaining Chairperson -  Supervisor Deloney is <u>not allowed</u> to change my schedule merely to accommodate the whim and fancy of a co-worker; but <u>only</u> for such matters as needing to fill a vacancy.*

384

386

388

*It is my contention that Supervisor Deloney orchestrated a termination of my services because she was notified that I had been in contact with Mr. Parker and she would be asked to provide a valid reasoning behind the issues of concern submitted thereto, arbitrary changing of my regular weekend and refusal to reassign it to me, and other discriminatory conduct.*

*Supervisor Deloney continually presented with behavior consistent with the disposition*

390   *that it would be easier to fire me because I am different and have not been accepted or*
392   *deemed acceptable by the other accessioners rather than to confront the bias and*
      *command the illegal treatment stopped. Being liked is not a bonafide job qualification,*
      *and renders this termination contrary to public policy. However, upon making that*
394   *statement, it was written into the next listed opening for that position : I cannot recall*
      *specifically; however, it was something to the effect of must be able to establish and*
396   *maintain social relationship with laboratory staff. Unfortunately, I would require an*
      *accommodation in that respect, because I do not maintain social relationships – and*
398   *generally, you cannot require that someone become friends with a co-worker – that is not*
      *a legal action.*

400

### 6. DID YOU RECEIVE ANY WRITTEN WARNINGS BEFORE YOU WERE
402   ### FIRED? IF YES, PROVIDE THE DATES AND REASONS FOR WARNINGS
      ### BELOW.

404

      *Yes, I received three disciplinary statements on one day with no prior notification that I*
406   *had done anything. One requests a one-day suspension; one requests a three-day*
      *suspension and one requests a suspension pending permission to terminate for failing the*
408   *performance review. Although this contrary to company policy which requires a verbal*
      *warning, and continues along a line of progressive disciplinary action, I was notified that*
410   *because I spoke with Supervisor Deloney about the treatment I was receiving (in the*
      *letter and then in the meeting about the letter), she was set to fire me – because anyone*
412   *who complains about being discriminated against –even if they are treated as badly as I*
      *am is considered a "problem employee" by Hurley and is discharged; I should have just*
414   *decided to "grin-and-bear" it; do my time to remain employed there throughout probation*
      *and then I could say something. However, I was told my probation had ended on one day*
416   *when I was sick. (I had food poisoning – which Supervisor Deloney knew before I went*
      *home the previous night)The problem is that the inflammation in the intestines triggered*
418   *excessive pain in my uterus – where I have fibroids. Anytime my intestines become*
      *inflamed with excessive gas or I have diarrhea – or constipation, I have double the pain*
420   *because of my fibroids. Nevertheless, the probationary period was up on that day.*

422   ***In regard to the Record of Disciplinary Action which holds a 1 day suspension for the***
      ***charge of violating Rule # 5 (Probationary Attendance), specifically described as:***
424

      *1. You called off for your shifts on Nov.16, Nov. 17, and Nov. 18, 2007.*
426

      *The other new employee, Tammy called in several days in one month because her son*
428   *was sick and called in several days in one month because she was sick. Tammy has not*
      *been disciplined for any of her absences.*
430

      *2. As a probationary employee, you are subject to disciplinary action for each absence.*
432

434   *I am being subjected to disparate treatment in retaliation for not accepting the harassing treatment from co-workers in the laboratory without complaint. Tammy*

436   *has not received discipline for either of those absences. Further, it is against company policy to take time off for your child being sick – she was not qualified (yet) for FMLA; however, as stated – she was not disciplined for those absences.*

438

440   *2. Future violations will result in progressive discipline action, up to and including termination.*

442

      *No response is required for this statement.*

444

446   **In regard to the Record of Disciplinary Action which holds a 3 day suspension for the charge of violating Rule # 12 (Careless Workmanship), specifically described as:**

448

450   *1. Specimens received on Nov. 26, 2007 did not meet HMC patient identification goals.*

452   *First and foremost, I cannot be held responsible for the failure of specimens received to meet identification goals. I have no authorization to handle specimens outside the*

454   *capacity of their receipt and processing (accessioning) inside the laboratory.*

456   *HMC patient identification goals have not been identified to me at any time by any managerial staff member in the laboratory. I cannot thereby be responsible for*

458   *attaining "goals" that were not presented.*

460   *Supervisor Deloney specifically stated to me that it is the responsibility of the medical technicians to check the labels on the specimens to ensure that they match the labels*

462   *generated in the accessioning of the specimens.*

464   *Supervisor Deloney also stated that while it is the responsibility of the medical technicians to do so, it is helpful for the accessioners to check as well. She further*

466   *stated that when there are so many coming in from the in-house, it is not necessary to "really focus on that because really it is the med techs responsibility".*

468

      *2. The CISCO label name and birthdate did not match the MISYS label name and*

470   *birthdate.*

472   *Although she simultaneously claims noone has ever come to her to speak to her about me in regard to mistakes, Supervisor Deloney presents that a med tech stated to her*

474   *that a label from accessioning did not match the label on the specimen sent from the floor.*

476

478
480
482

*Had this occurred without the intent to compile a record upon which to terminate my employment, Supervisor Deloney would have addressed it with me at the time it happened – which is her demonstrated policy for when mistakes occur – she addresses them at that time. In fact, the intention to terminate my employment is the only reason this ludicrous, untruth is being presented.*

484
486
488
490

*As previously indicated, managerial staff claims that when I say I am being singled out and subjected to disparate, discriminatory treatment – those claims cannot be verified. However, upon "claim", "accusation", "assertion" of other laboratory employees, Supervisor Deloney claims I have made the mistakes attributed to me. Mistakes which she neither witnessed, nor was able to verify except through hearsay, which frankly holds the same weight as the claims, accusations, and/or assertions presented by me.*

492
494

*Nevertheless, I am told by management that I have done these things because other employees say I have and those employees have partaken in no adverse behavior against me because they don't admit to doing so.*

496
498
500

*It is the policy of the medical laboratory that if labels do not match, that the medical technician discard the specimen and contact the floor. In addition, when a specimen was mislabeled by me (which happened when I first began employment), it has always been that the medical technician will bring the specimen to me so the test can be credited by me if they have not done so.*

502
504
506

*Nevertheless, I have no access to the CISCO system. CISCO is only accessible by the nurses and doctors who input the requested tests instead of sending the request to the lab to be input. If, for example, a slip lists 0059437 as the medical record number but that is not the medical record number of the person whose name is on the specimen, the wrong information will print.*

508
510
512

*The labels are acquired and printed by medical record number, not by name. I cannot force the handwriting of the submitting personnel to correspond with what is in the MISYS system, nor can I force the MISYS system to print out incorrect information so that it matches the CISCO information. I can only input what information is supplied and accept the results that information yields – otherwise I would be fraudulently altering medical evidence, which violates numerous laws, I am sure.*

514

3. *MISYS labels were also generated that did not have the corresponding tube type.*

516
518
520

*I do not understand how I can be held responsible for MISYS labels being generated for tube types that were not submitted to the laboratory. MISYS prints labels whether the specimen is received or not; there is nothing anyone can do about it, and Supervisor Deloney initially stated to simply throw the labels away in those instances.*

522     *This is a common occurrence that is caused by the entry of orders placed outside of the*
*laboratory and the receipt thereof; it is also an occurrence for all accessioning staff, yet*
*I am the only person who has been written up for it and whose employment is being*
524     *terminated for its occurrence. When specimens are submitted to the laboratory with*
*orders already entered in CISCO, it is not uncommon for the floor that submitted the*
526     *orders (transmittal) and specimens to have provided an incorrect specimen or no*
*specimen at all. That is why special codes have been developed for crediting out tests*
528     *that were ordered that cannot be performed for such reasons. Those special codes*
*include:*

530          ***IMSP:*** *Improper specimen / tube type; please reorder*
     ***SNOT:*** *Specimen not received*
532          ***LABL:*** *Identity unclear / improperly labeled specimen*

534     *Supervisor Deloney directly stated to me that when there is an issue regarding a*
*specimen, including non-receipt, or wrong one, the procedure I am to follow is:*
536

538     *Select the "Move" option from the error message options. This option functions to*
*identify the problem with the specimen directly to the floor and prints a label*
*indicating that the test requested has been moved the "problem list". That list is*
540     *immediately electronically forwarded to the floor that input the order so they can*
*address the problem, submit the proper specimens, and the test can be run.(When*
542     *routed to the problem list, the labels list "PROB" in the corner as opposed to ex.*
*"LAV" for a lavender-top. These labels are distinguishable from the labels which have*
544     *specimens which were received.*

546     *Supervisor Deloney later revised her instructions to indicate that if it was necessary to*
*"move" the tests to the problem list, I was to set the labels to the side and hold them. If*
548     *the specimen required had not been received by the time my shift ends, I am to take the*
*labels held, credit out the test with one of the previously mentioned codes, and throw*
550     *the label away.*

552     *During the Nov. 30 meeting with Supervisor Deloney regarding terminating my*
*employment, Supervisor Deloney stated that medical technicians had dug through the*
554     *garbage and located labels printed by me. Notwithstanding that this is genuine*
*hearsay, the labels were listed as having been routed to the problem list.*
556

558     *(Again, when the test is "moved", a label prints as verification of that movement. The*
*label will, instead of indicating itself as going onto a RED or LAV, etc.,  in the top*
*right corner, indicate that it is a PROB, meaning it is on the problem list and has no*
560     *specimen to be placed upon). That is the label to be held until the specimen arrives or*
*the test crediting completed.*

562



564      *That is the STANDARD PROCEDURE, so it is indeterminable the justification management has for issuing a disciplinary action to me for regular laboratory policies being followed in response to regular laboratory issues.*

566

568      4. *Also, an arterial blood gas was sent to the chemistry department without a MISYS label.*

570      <u>*This is simply a lie.*</u> *The MISYS label prints off with a large label that has a barcode, and two smaller labels that have the accession number on it. All three labels provide identification of the patient and the orders assigned thereto.*

572

574      *Emily, the med tech in Chemistry indicated that she did not receive the barcode label and asked me if I still had it or had thrown it away. She read the name of the patient from the small label that was affixed to the blood gas. I did not have the barcode label, and told her that I brought it over with the blood gas and set the blood gas on top of it. She then stated she did not see it and would reprint the label (which I offered to do for her – but she said it was "no problem; [she] would reprint it").*

576

578

580

582      *I cannot account for a specimen or label once it leaves me. I collected the label to that blood gas and took it to the chemistry department. It was not in my possession or in my garbage can. However, I remember taking it to the chemistry department – I only had the blood gas and label in my hand.*

584

586      <u>*This is an outright lie!*</u>

588      5. *Future violations of HMC work rules will result in progressive disciplinary action, up to and including termination.*

590

     *No response is required for this statement.*

592

594      *Supervisor Deloney goes on to indicate I have trouble comprehending the working of the computer and how "two programs can interact with each other".*

596

598      ***In regard to the November 30, 2007 Record of Disciplinary Action which provides penalty of suspension pending permission to terminate: It is my understanding this is based upon the Employee Performance Review.***

600

602      *Said document maintains that my technical work (the actual doing of the job, the productivity is worthy of a 2.79. I will direct attention to number 7, which indicates I process and prepare specimens according to established policies and procedures.*

604

606     It continues by stating that I show mild irritation and impatience toward internal and
        external customers and provides example of communication regarding how to pronounce
608     my name. (1) That communication was for the laboratory department, not customers,
        and indicates within the message that we have been co-workers since August.

610
        The Performance Review indicates I receive a 0 for teamwork; however, it is I who have
612     been falsely accused, verbally assaulted, and treated disparately since I began
        employment in the laboratory, irrespective of the great lengths I have gone through to be
614     accepted to this "team". If the "team" is not willing to accept you, you cannot score high
        on "teamwork" – you aren't welcome to contribute.

616
        Supervisor Deloney indicates that I am reluctant to acknowledge my own weaknesses or
618     minor mistakes. Here's one I acknowledge :providing honest feedback, per her request, to
        Supervisor Deloney – that was a mistake; my concerns should have only been brought to
620     the union, the Civil Rights Department, and the Equal Employment Opportunity
        Commission. My weakness was placing faith in deceptive people who laugh behind my
622     back at me and then in my face when they are firing me.

624     Supervisor Deloney states that I failed to meet satisfactory levels of productivity because I
        was reading the newspaper. But, she deceives with the rest of the comment. **_There were_**
626     **_no additional outreach specimens left._** Additionally, she and I had discussed
        previously that the seasoned accessioners (those at tube #111 instructed me not to do the
628     outreach because they did not feel I had been there long enough to be allowed to do that
        either); I was allowed to do a few here and a few there. Supervisor Deloney refused to
630     address that as well.

632
*7.* **DID YOU VIOLATE COMPANY POLICY? IF YES, PROVIDE SPECIFIC**
634     **DETAILS BELOW.**

636     No; I did not violate company policy. I do think that I have shown where company policy,
        state and federal laws were violated against me, though.
638
        In fact, Supervisor Deloney spent 20 minutes disciplining me for ordering an FETIBC
640     for the IONCAL that was requested. The misorder, however, was not mine. When that
        was stated to her, she said, "Oh, well, I was sure it was you, because you're new." It is
642     not necessary to admit to the mistakes of another – due process is the law of this land.
        Give me what is due – not what is someone else's. Supervisor Deloney was visibly
644     angered by the fact that I told her it was not my writing on the order slip.

646     To further your investigation, I can provide further examples of the discrimination I was
        shown by the  management staff. It was made clear that because the accessioners did not
648     care for me I was to be forced out. Specific instances of disparate treatment from

*supervisory staff toward me include:*

650

*Sheila v. Dr. Walsh*

652   a.  *I was told to order tests of GCC and GENBHS on the same accession number. On
        one occasion in doing so, one of the tests came back negative and one came back*

654       *positive. The physician, per Sheila Moore, could not determine why this would occur,
        ignored the positive result and failed to provide treatment to the patient – which*

656       *allowed the disease to progress.*

658       *The manner in which I ordered the test was the same which the other accessioners
        ordered the test. In fact, Supervisor Deloney stated that it was just "bad luck" that*

660       *this happened to the tests when I ordered, but it was a learning moment for all of the
        lab, because even she did not understand and needed to speak to Sheila for*

662       *clarification of how the GCC and GENBHS were to be ordered.*

664       *Sheila Moore, however, came into the accessioning area and berated me in front of all
        the other accessioners. Then she stated that we are lucky the patient is going to be*

666       *alright and "It's a lot to remember". This public humiliation was in sharp contrast to
        Dr. Walsh's method of addressing the situation. He sent a mailbox through*

668       *Sunquest® to all accessioners (not sure of any other recipients) which explained that
        the GCC and GENBHS were two different tests done on pregnant patients and they*

670       *had to be ordered on two accession numbers (even if only one specimen is received)
        because of that.*

672

674       *When I indicated that I felt singled out by Ms. Moore, I was routinely ridiculed by
        Supervisor Deloney, who prefaced every statement to me with, "I'm not trying to*

676       *single you out...".*

*Different Down-time Rules*

678   b.  *I was told that in periods where there is no work for me to do, I am allowed to read a
        book, magazine, or use the internet to pass the time.*

680

682       *Supervisor Deloney stated to me that other accessioners (sitting at Tube station
        ID#111) came to her to complain about the fact that I had opened a newspaper to read*

684       *it when they still had work to do. It was of no consequence to Supervisor Deloney that
        I had completed my work and there was no other work available to me.*

686       *On numerous occasions, that same group of accessioners have pulled out newspapers,
        books, magazines, and done shopping online. Yet, these options, though presented to*

688       *me are not accessible to me when the accessioners at Tube Station ID# 111 are not
        happy about it.*

690

692       *Please note, this is another occurrence where Supervisor Deloney indicates persons
        are coming to her with complaints of my work. This clearly shows the ambiance of the*

694 *laboratory toward me was always hostile with efforts continual toward terminating my employment.*

696 *Registering and Accessioning*

    c. *I was told to do twice as much work as the other accessioners or lose my job. This*
698 *would be done by handling all of the in-house work and registering as much outpatient/outreach work as the accessioners who did none of the in-house work.*

700     d. *I was told to work without taking a break, and was monitored on time when I went to the restroom.*
702

*Personal use of mailbox system*

704     e. *On Nov. 30, Supervisor Deloney stated to me, "People are laughing at you behind your back because you don't like how your name is mispronounced".*
706

708 *Supervisor Deloney, when introducing me to Sunquest stated that it is a private system that is used for communicating within the laboratory. The manner in which she explained Sunquest, indicated that it was a system within the laboratory only; she*
710 *did not present any indications that it went to clients of the laboratory.*

712 *It is incomprehensible to me that Supervisor Deloney thinks it appropriate or professional to laugh (she literally laughed) at the fact that I took issue with my name*
714 *being mispronounced. It is customary in my culture that when a person has known you for quite some time and they continue to mispronounce your name, it is because*
716 *they intend to show disrespect. Irrespective of another person's perceptions as to why calling a person named Lowana (with a badge that says so) Jawanda would occur,*
718 *that is my custom and my belief.*

720 *Had a physician complained to the laboratory about his or her name being mispronounced, there would be no issue- there would be disciplinary action taken.*
722

724 *Nevertheless, Supevisor Deloney felt it appropriate to mock me for providing clarification on the pronunciation of my name by laboratory staff who had been*
726 *working with me almost two months at that point.*

728 *Further, she indicated that this was an inappropriate mailbox. (When introducing the mailbox system, she stated that if I needed to communicate with only one person or with everyone in the laboratory, I could use Sunquest – now that I have, it is*
730 *inappropriate to do so). Supervisor Deloney indicated that the mailbox system was not for such personal use; however, I have received mailboxes that are personal use,*
732 *including requests for fundraising support (for laboratory staff children), and offers for things such as the pampered chef for Christmas shopping. Not everyone celebrated*
734 *Christmas, yet these personal mailboxes are routinely placed in Sunquest, without issue.*
736

738      *It is differential treatment. It is separating and classifying me as different from the rest of the laboratory staff.*

740      **Wrong specimens received from ER**
         f.   *When the ER sent the wrong specimens, I contacted them (as told is the procedure),*
742      *notified them of the problem, and requested the proper specimen.*

744      *The ER physician called the laboratory and spoke with Supervisor Deloney. Supervisor Deloney, in turn charged into the accessioning area straight to me, yelled,*
746      *"What did you call the ER for; they said they sent the right specimens." I showed her what I received and the requested tests (on a downtime slip). She took the paperwork*
748      *and came back about 15 minutes later with new tests to be ordered on the specimens received – the tests requested could not be run from the specimens submitted, as was*
750      *indicated to ER by me.*

752      *Nevertheless, Supervisor Deloney accused me of improper behavior and I addressed that with her. She responded that I don't take constructive criticism well. To my*
754      *credit, in order for criticism to be constructive, it needs to be accurate.*

756      *Supervisor Deloney has not ever yelled at someone or thrown open the door and charged in to someone – not in the time I've been there. It was physically aggressive,*
758      *and an unnecessary public display.*

760      **Regular procedure for IONCAL when Blood Gas submitted**
         g.   *It is not uncommon for the floor to send a blood gas when an IONCAL has been*
762      *ordered, so that test can be run from it.*

764      *When that happens, there will be no orders listed for the blood gas.*

766      *It has been procedure (all during my employment) that when this is the case, a label will indicate that no test was ordered on the blood gas specimen. We are to place the*
768      *label on the blood gas and take it to the chemistry department with the other specimens for that order.*

770
         *Once again, this is a standard procedure that I am being disciplined for.*
772

         **Microbiology specimens counseling (personal counseling – all others received a**
774      **mailbox)**
         h.   *Supervisor Deloney indicated she would speak with Sheila for explanation on the*
776      *GCC, GENBHS testing for clarification that she could pass on to the rest of the staff.*

778      *She then called me into her office to discuss the newsletter, stated she would be sharing the same information with the rest of the staff, and stated that she "Still does*
780      *not understand, but they are supposed to be ordered on two accession numbers, for*

782    *whatever reason".*

784    *Supervisor Deloney indicates that she provided counseling to me on how to order microbiology specimens. That is untrue.*

786    *In fact, Supervisor Deloney only stated the above as follow-up to obtaining clarification and stated that "All microbiology specimens need their own accession*
788    *number; (I) forgot to tell you that when you started".*

790    i.    *If Supervisor Deloney is stating that she counseled me on the proper ordering of microbiology specimens, then she does so in effort to validate terminating my*
792    *employment. It is the responsibility of Supervisor Deloney to ensure that I am provided with the how-to of the position, whether it is ordering a microbiology*
794    *specimen or ordering a chemistry test. It is improper protocol to compile a record of disciplinary infractions to terminate employment based upon procedures that were*
796    *never indicated.*

798    **Complaints about med techs (okay for others, but not me)**
       j.    *I sent a private mailbox to Sheila Moore, laboratory director and asked her to advise*
800    *me on how to handle announcing the blood gas when noone is in chemistry.*

802    *I received a blood gas and delivered it to the chemistry department. As my fibroid was flaring, I was not able to walk very far, so I announced over the PA that there was a*
804    *blood gas in chemistry (new procedure). The med tech in chemistry (he was at the back of the lab and walking back and forth ) came to the front and shouted, "Doesn't*
806    *anyone see me back there?" with his arms flailing about.*

808    *Edith stated to him that he needed to be up front to receive the specimens. (Another witness to his behavior was Turkessa)*
810

812    k.    *If that med tech was kidding around, he showed no indications of doing so. He did not shout at the other person who had announced a blood gas over the PA, and I felt he*
814    *was unprofessional and yelling at me.*

816    l.    *Supervisor Deloney stated that I make things up.*

818    *With 2 eye-witnesses, I can assure you I have verification this is not fabricated.*

820    **Constantly changing job specifications when done to what was previously requested**
       m.   *Supervisor Deloney continually changed what I am supposed to be responsible for doing – and it was always different from what she had initially indicated.*
822

824    n.    *She stated, "This is really a work in progress, so none of us really know how things are supposed to be – we're all learning."* **The difference is I am being disciplined**

*for it.*

826

*Employee conduct rule violations*

828    o.  *When I indicated that employee conduct rules were being violated toward me,
Supervisor Deloney indicated, "We'll get through this" and refused to address the*
830    *issues.*

832    *Not offered hours, per regulations that mandate to do so*
    p.  *It is proper procedure to offer any overtime hours available to the person with the*
834    *lowest number of hours worked. However, it was found that when April (one of the
accessioners) called off, Tammy was simply placed in her slot.*
836
    *By right those hours were to be posted and made available; however, Supervisor*
838    *Deloney indicated it was unnecessary to do so because Tammy was willing to come.
Unfortunately, Tammy was not the person with lowest number of hours each time,*
840    *and was thereby not entitled to those hours. In fact, Tammy said to me that she
"Wished (she) hadn't said  (she'd) come in for April because she was working so*
842    *much she was tired".*

844    *20 hours removed from overtime credit*
    q.  *The overtime calendar shows credit for overtime removed from my name.*
846
    *This happened to no other employees.*
848
    *Overtime calendar shows different treatment (written on calendar :"called off",*
850    *"called off",  and "called off". No other employee has that under their name).*
852
    r.  *No other employee has the days they called off listed on the overtime record. This
shows a record for termination was being compiled in retaliation for being sick, for*
854    *asking for discrimination issues to be addressed, and for being in contact with Mr.*
856    *Parker.*

858    *Numerous variations from what was promised in interview that changed based upon
moodiness of Supervisor Deloney.*
860    s.  *Supervisor Deloney stated things that changed upon whim of other coworkers,
including:*
862
    i.  *Maintaining the in-house specimens is most important*
864    *(She began demanding I do twice as much work – and that still wasn't enough)*
866    ii.  *You will receive a minimum of 30 hours per week*
    *(She notified my union rep that if she wants to work me one day per week, she will*
868    *do so – and there is noone and nothing to stop her.)*

870   8. **<u>WERE YOU AWARE OF THE POLICY BEFORE THE INCIDENT OCCURRED WHICH CAUSED YOU TO BE FIRED?</u>**

872

874   *No. I was not only not aware of any "policy" violations; I was not made aware until I was being terminated that I was being accused of violating any.*

876   *In fact, because I did not violate any policies Supervisor Deloney – aside from constructing a discharge - attempted to call into question my ability to comprehend the*

878   *basics of the computer, with specific regard to "how two programs can interact with each other". An issue never mentioned previous to her decision to terminate my employment. I*

880   *think that had there been a problem with my computer skills, it would have been mentioned long before the end of November (3 months into the employment) inasmuch as*

882   *that is something that greatly impacts the position – 60% of the work is computer-based, the other 40% is handling the specimen (labeling, turning in to proper department).*

884

886   *Nevertheless to address the assertion that my intellect was somehow lacking, I affirmatively state for the record:*

888   *I hold two Associate Degrees, CAD and Robotics Simulation Certification, I design*

890   *webpages, create short films and have a professional background of creating and maintaining databases and intranets with my tested-at-**expert-level** computer skills.*

892   *One degree is in Office Administration – which requires adequate exposure to and proficiency with computer-based protocol. I have previously held positions which*

894   *required Helpdesk support  and adequately provided it as well. To the assertion, or rather, assumption that I had difficulty comprehending how the computer programs*

896   *interacted, I simply state: Hurley Medical Center offered no challenges in regard to the interaction of the computer within it's programming to me.*

898   *Supervisor Deloney  also began regularly accusing  me of making careless mistakes, when the work had not been done by me. I was routinely shown the errors of other lab*

900   *clerk's and told it was my own. For example : Supervisor Deloney spent 20 minutes disciplining me for ordering an FETIBC for the IONCAL that was requested. The*

902   *misorder, however, was not mine. When that was stated to her, she said, "Oh, well, I was sure it was you, because you're new." It is not necessary to admit to the mistakes of*

904   *another – due process is the law of this land. Give me what is due – not what is someone else's. Supervisor Deloney was visibly angered by the fact that I told her it was not my*

906   *writing on the order slip.*

908   *It wasn't a verbal warning, but it was her attempting to compile mistakes to validate a termination. When she was told that it was not my work which was erroneous – neither*

910   *by handwriting, nor by the computer system number, she stated that I was "not willing to admit to my mistakes; and whether it was or wasn't my mistake it was information*

912   *that was good to have, so to listen anyway." Then she droned on for another 15 minutes*

914
916
918

*on procedure and policy that not only did I know, but I had never messed up. As previously indicated, when we made mistakes, it was usually pointed out with no disciplinary action attached thereto. However, once it was determined that my employment should be terminated, I was routinely accused of making mistakes that were made by other clerks.*

920
922
924

*We are required to write down the accessioning number on the order slip and the computer monitors who entered information into the system. As such, Supervisor Deloney was aware that these were not errors made by me – from the physical signature and the electronic one. Yet, she made that one of the bases for terminating my employment.*

**CONCLUSION**

926
928

It is my belief that my rights have been violated, including my civil rights, euql employment rights, and constitutional rights to my good name (14th Amendment).

930
932

I have been routinely discriminated against, not provided an equal employment opportunity; and my character, reputation, and work ethic have been defamed by co-workers and managerial staff in the laboratory.

934
936

As such is the case, it is my intention to pursue this matter through whatever avenues are made available to me, which is why a Civil Rights case has been initiated in this matter.

938
940

Thank you for your time; if I can be of further assistance, do not hesitate to contact me at your earliest availability.

942
944

Regards,

946

*Lowana S Dumas*

948

Lowana Shanell Dumas

950

952

ATT: Copy of Civil Rights claim filed

954

## CHARGE OF DISCRIMINATION

*This form is effected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.*

COMPLAINT/CHARGE NUMBER

MDCR # 383513

EEOC # 23A-2008-00809C

### MICHIGAN DEPARTMENT OF CIVIL RIGHTS and THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| NAME (Indicate Mr., Ms., Mrs.) Ms. Lowana Dumas | HOME TELEPHONE NO. (Include Area Code) (810) 249-7860 |
|---|---|

| STREET ADDRESS, CITY, STATE AND ZIPCODE 2615 Martin Luther King, Flint, MI 48505 | |
|---|---|

*Named is the employer, labor organization, employment agency, apprenticeship committee, state or local government agency who discriminated against me.*

| NAME Hurley Medical Center | # EMPL/MEMBERS 200 | TELEPHONE NO. (Include Area Code) (810) 257-9000 |
|---|---|---|

| STREET ADDRESS, CITY, STATE AND ZIPCODE One Hurley Plaza, Flint, MI 48503 | |
|---|---|

| CAUSE OF DISCRIMINATION BASED ON Race, Retaliation, Weight | DATE OF MOST RECENT OR CONTINUING DISCRIMINATION December 19, 2007 |
|---|---|

I, a Multi-Racial person who is 5'4 and weigh 105 pounds, believes the respondent's representative subjected me to unequal terms and conditions of employment, and suspended me on November 30, 2007, then discharged me on December 19, 2007. I believe it is due to my race and weight.

I began employment with the respondent on August 27, 2007, and last worked as a lab clerk.

**Discipline**              **11/30/2007**       **Race , Weight , Retaliation**

On or about October 16, 2007, I voiced a civil rights concern regarding employees making racially derogatory comments about my race and weight, and nothing was done. On November 26, 2007, the respondent's representative alleged that I mislabed blood specimen. I deny that allegation. On November 30, 2007, I was suspended pending termination. I believe I was suspended in retaliation for having voiced a civil rights concern regarding my race and weight.

**Discharge**              **12/19/2007**       **Race , Weight , Retaliation**

On December 19, 2007, the respondent's representative discharged me for allegedly mislabeling specimen. I deny the allegation. I believe I was discharged in retaliation for having voiced a civil rights concern regarding my race and weight.

This complaint is based on the following law:

Elliott-Larsen Civil Rights Act No 453, Public Act of 1976, as amended

Title VII, US Civil Rights Act of 1964, as amended

| I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>Feb.19, 2008      *Lowana S. Dumas*<br>Date            Signature of Charging Party / Claimant | NOTARY (When necessary to meet State and Local Requirements)<br><br>19 February 2008<br>SUBSCRIBED AND SWORN BEFORE ME THIS DATE (Day, month and year)<br><br>*Richard David Dicks Jr.*<br><br>Commissioned in ___RICHARD DAVID DICKS JR.___ County<br>            Notary Public, State of Michigan<br>Acting in _____ County of Genesee _____ County<br>            My Commission Expires 03-04-2014<br>            ...ting in the county of_____<br>Commission expires_____ |
|---|---|

EEOC FORM 5/ CR406 (Rev 04-05)          PREVIOUS VERSIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

JS 44 (Rev. 12/07)      **CIVIL COVER SHEET**    County in which action arose   GENESEE

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
LOWANA SHANELL DUMAS

**DEFENDANTS**
HURLEY MEDICAL CENTER ET AL
(SEE LIST OF 18 DEFENDANTS)

**(b)** County of Residence of First Listed Plaintiff   GENESEE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   GENESEE
(IN U.S. PLAINTIFF CASES ONLY)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
IN PROPRIA PERSONA

Att

Case: 2:10-cv-12661
Judge: Feikens, John
MJ: Morgan, Virginia M
Filed: 07-06-2010 At 09:01 AM
IFP Lowana Dumas v. Hurley Medical Center, et al (dw)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☒ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
5 USC §5596; 18 USC §241; 18 USC §242; 18 USC §245; 21 USC §141; 29 USC §158; 42 USC §1201; 42 USC §1983;& 42 USC §2000...

Brief description of cause:
WRONGFUL TERMINATION IN RETALIATION FOR REPORTING HARASSMENT AND DISCRIMINATION.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   7,500,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE      DOCKET NUMBER

DATE
July 4, 2010

SIGNATURE OF ATTORNEY OF RECORD
*Lowana S. Dumas*

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                         ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


2.          Other than stated above, are there any pending or previously          ☐ Yes
            discontinued or dismissed companion cases in this or any other        ☒ No
            court, including state court? (Companion cases are matters in which
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


Notes : _____