**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LOWANA SHANELL DUMAS,

    Plaintiff,

v.                                                       Case No. 10-12661

HURLEY MEDICAL CENTER, et al.,

    Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANT CITY OF FLINT'S
RENEWED MOTION FOR SUMMARY JUDGMENT**

Pending before the court is Defendant City of Flint's (the "City's") renewed motion for summary judgment, in which the City argues that Plaintiff Lowana Dumas's claims against it must be dismissed because she is unable to show that an employment relationship existed between her and the City. The motion has been fully briefed, and the court heard oral argument on June 27, 2012. *See* E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the City's motion will be granted.

**I. BACKGROUND**

This case arises out of Plaintiff's employment as a laboratory clerk at Hurley, a public hospital in Flint, Michigan. Plaintiff claims she was discriminated against because she is a woman, multi-racial, and because of her mental and physical impairments. Hurley employees allegedly harassed Plaintiff on a daily basis about her physical appearance, using racial slurs. After filing complaints against her co-employees, Plaintiff's supervisor, union representative, and Hurley's Equal Employment Officer allegedly treated Plaintiff in a hostile manner and began making arbitrary changes to

Plaintiff's working conditions in hopes she would voluntarily quit. Such changes included requiring Plaintiff to use the public restroom instead of the private employee restroom, switching her from second to third shift, and expecting her to meet a quota that Plaintiff was informed at her employment interview would not exist. Plaintiff alleges that the harassment culminated in her receiving three disciplinary reports and, as a result, her termination. Plaintiff's employment with Hurley lasted from August 2007 until December 2007.

Plaintiff initiated this lawsuit on July 6, 2010, and filed her most recent amended complaint on February 22, 2012, asserting retaliatory discharge, hostile work environment, and employment discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"), the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq.*, ("ADA"), and the Michigan Elliot-Larsen Civil Rights Act, Mich. Comp. Laws 37.2101, *et seq.*, ("ELCRA"), against the City, Hurley, and individual employees of Hurley. Plaintiff has also pled a hybrid § 301 claim under the Labor Management Relations Act against Hurley and AFSCME, the union that represented Plaintiff under the collective bargaining agreement entered into between Hurley and the union. The City has moved for summary judgment, arguing that Plaintiff is unable to establish that the City was her "employer," a necessary requirement to prevail on each of her claims against it.

Relevant to a determination of whether the City constituted Plaintiff's "employer" under the employment discrimination laws is the relationship that exists between the City and Hurley. Hurley is owned by the City and is accounted for in the City's "Comprehensive Annual Financial Report" as an enterprise fund. (Bawa Decl. § 3, Dkt.

# 139-2.) Management and supervision of Hurley has been delegated to the Board of Hospital Managers ("Board"), a multi-member body established by the City of Flint Charter, (City of Flint Charter § 6-201, Dkt. # 141-2), and whose members are appointed and removed by the Mayor and City Council of Flint, (*id.* at § 6-101(B)(3).) The Charter provides that the Board "shall appoint a Director for each of the City Hospital facilities, who shall serve at its pleasure, and a Personnel Director, subject to confirmation by the Mayor, and serving at the pleasure of the Board." (*Id.* at § 6-202(C).) The Board has the discretion to appoint a comptroller, director of nursing, and assistant hospital director for each of the city-owned hospitals. (*Id.*) Although Hurley is owned by the City and managed by a multi-member body established by the City Charter, Hurley apparently does not share common offices, record keeping, or bank accounts with the City. (Smith Aff. ¶ 6, Dkt. # 141-4.)

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The nonmoving party must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson v. Liberty*

3

*Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. When deciding summary judgment motions, "the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The court does not weigh the evidence to determine the truth of the matter, but rather to determine if the evidence creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson*, 477 U.S. at 249).

### III. DISCUSSION

A necessary element of each of Plaintiff's claims against the City is a showing that an employment relationship existed between her and the City. *See* 42 U.S.C. § 2000e-2(a) (Title VII); *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 795 (observing that "Congress chose to limit Title VII liability to employers only"); 42 U.S.C. § 12111(5)(A) (ADA); *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (holding that in order to establish liability under the ADA, the plaintiff must demonstrate that the defendant was an employer within the meaning of the statute); Mich. Comp. Laws § 37.2202(1) (ELCRA); *Seabrook v. Mich. Nat'l Corp.*, 206 Mich. App. 314, 315–16 (Mich. Ct. App. 1994) (affirming state trial court's grant of summary judgment to the defendant on an ELCRA claim because the plaintiff failed to

show that an employment relationship existed between her and the defendant). In its motion for summary judgment, the City argues that Plaintiff is unable to make such a showing.

Plaintiff does not argue that the City was her direct employer. Instead, she contends that Defendants Hurley and the City, despite being ostensibly independent entities, constitute a single enterprise for purposes of Title VII, ADA, and ELCRA liability. Specifically, Plaintiff argues that the two entities are "so interrelated that they constitute a single employer subject to liability under" the relevant statutes. *Swallows*, 128 F.3d at 993.

Plaintiff's argument is founded on numerous Sixth Circuit decisions which have held, at least in cases involving private companies, that a defendant which does not directly employ a plaintiff may nevertheless be liable under the "single employer" or "integrated enterprise" doctrine. *See, e.g.*, *id.*; *York v. Tenn. Crushed Stone Ass'n*, 684 F.2d 360 (6th Cir. 1982). Under this doctrine, courts look to the following four factors when determining whether separate entities should be treated as an "integrated enterprise" for purposes of establishing a plaintiff's employer: "(1) interrelation of operations; (2) common management; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Swallows*, 128 F.3d at 994.

The doctrine, however, finds its provenance in National Labor Relations Act jurisprudence, a statute regulating the labor relations of private entities, and was only later applied by the Sixth Circuit, and many of its sister circuits, to Title VII and ADA

5

claims that also involved private entities. *See York*, 684 F.2d at 362; *Schwarz v. Berrien Springs Police Dep't*, No. 1:98-CV-88, 1999 U.S. Dist. Lexis 12134, at *25 (W.D. Mich. Aug. 5, 1999) (observing that the Sixth Circuit has looked to the "integrated enterprise" doctrine in cases involving private employers); *see also Lyes v. City of Riviera Beach, Fl.*, 166 F.3d 1332, 1342 (11th Cir. 1999) (compiling cases from numerous circuits applying the doctrine in the context of Title VII). As one might expect, "a test designed to operate in the context of private entities does not fit well cases involving governmental entities." *Lyes*, 166 F.3d at 1342; *see also Trevino v. Celanese Corp.*, 701 F.2d 397, 404 n.10 (5th Cir. 1983) ("[T]he ["integrated enterprise"] standard is not readily applicable to governmental subdivisions, for it was 'developed by the National Labor Relations Board to determine whether consolidation of separate *private* corporations is proper in determining the relevant employer for purposes of enforcing the National Labor Relations Act.'" (quoting *Owens v. Rush*, 636 F.2d 283, 286 n.2 (10th Cir.1980))).

      The Eleventh Circuit in *Lyes* specifically concluded that neither the "common ownership and financial control" factor nor the "common management" factor is readily applicable to cases involving public or governmental entities. With respect to the first of these two factors, *Lyes* observed that "counties or towns, or smaller subdivisions such as local agencies, may share sources of ultimate political control or funding, yet be wholly distinct with respect to their day-to-day operations or their control over relationships with employees." 166 F.3d at 1343. *Lyes* also found the "common management" prong a poor yardstick for determining the degree of integration between

6

two governmental entities because "two public entities may share managers or other employees while remaining politically separate and distinct." *Id.* For good measure, *Lyes* identified an additional reason, based on federalism and comity concerns, why a court should be hesitent to apply the doctrine in cases involving governmental entities:

> When it comes to creating subordinate public bodies and defining their relationship to one another and to itself, 'the state is supreme and its legislative body, conforming its action to the state Constitution, may do as it will.' . . . We owe such determinations by the state legislature not only deference, but great deference.

*Id.* at 1343–44 (quoting *City of Trenton v. State of N.J.*, 262 U.S. 182, 186–87 (1923)).

*Lyes* ultimately rejected the traditional four-part "integrated enterprise" standard and adopted a different standard for determining "whether to aggregate state and local governmental entities for Title VII purposes." *Id.* at 1344. The court announced the standard as follows:

> [W]e hold that when assessing whether multiple governmental entities are a single "employer" under Title VII, we begin with the presumption that governmental subdivisions denominated as separate and distinct under state law should not be aggregated for purposes of Title VII. That presumption may be rebutted by evidence establishing that a governmental entity was structured with the purpose of evading the reach of federal employment discrimination law. Absent an evasive purpose, the presumption against aggregating separate public entities will control the inquiry, unless it is clearly outweighed by factors manifestly indicating that the public entities are so closely interrelated with respect to control of the fundamental aspects of the employment relationship that they should be counted together under Title VII.
>
> The standard we adopt is not whether a fact finder reasonably could conclude the plaintiff has overcome the presumption. Instead, the standard is whether the fact finder reasonably could conclude the plaintiff has *clearly overcome the presumption*. The adverb "clearly," which derives from the federalism concerns we have discussed, is meant to be limiting. It is a thumb on the scale, and sometimes it will be decisive because federalism concerns should sometimes be decisive. Absent evidence of evasive purpose, in order to survive a motion for summary judgment, a plaintiff will have to show that

7

> a reasonable fact finder could conclude that the presumption of distinctness is clearly outweighed.

*Id.* at 1345–46 (emphasis added). Although the Sixth Circuit has never adopted a standard for determining whether two governmental entities ought to be considered an "integrated enterprise" for the purposes of liability under Title VII or the ADA, at least two district courts in the circuit have applied the *Lyes* standard in the absence of a Sixth Circuit directive. *See Burkhard v. Henry Soil & Water Conservation Dist.*, No. 3:02-CV-7428, 2005 WL 1863828, at *3 (N.D. Ohio Aug. 3, 2005); *Schwarz v. Berrien Springs Police Dep't*, No. 1:98-CV-88, 1999 U.S. Dist. Lexis 12134, at *29 (W.D. Mich. Aug. 5, 1999). Finding the reasoning of *Lyes* convincing, this court will likewise apply the standard outlined above.

The *Lyes* court explained that "[s]everal factors" will be considered when determining whether a fact finder could reasonably conclude that the presumption in favor of distinctness is clearly outweighed. *Lyes*, 166 F.3d at 1345. The "NLRB factors of 'interrelation of operations' and 'centralized control of labor operations' may continue to be helpful in the inquiry." *Id.* (internal citations omitted). Other "[u]seful 'indicia of control' may be drawn from the agency context, including the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; and the obligation to pay or the duty to train the charging party." *Id.* The court noted that the "list of factors is not intended to be all inclusive, and consideration must be given to the totality of the circumstances." *Id.* After reviewing the various factors that other courts had considered, the *Lyes* court concluded "that they all share a common focus: all of them seek to determine who (or which entity) is in control of the

fundamental aspects of the employment relationship that *gave rise to the claim.*" *Id.* (emphasis added).

Plaintiff points to a number of factors to show that the City and Hurley should be considered one entity. Under the City's Charter, Hurley is managed by the Board of Hospital Managers ("Board"). (City of Flint Charter § 6-202, Dkt. # 141-2.) The Board is a multiple-member body that was established by the City and "may exercise those powers and duties granted by the City, provided that they do not conflict with provisions of [the City's Charter] or state law." (*Id.* at § 6-101(A).) The City's Mayor appoints the Board's members with the approval of the City Council ("Council"). (*Id.* at § 6-101(B)(3).) Members can only be removed for cause by the Mayor and with the Council's approval. (*Id.*) All rules adopted by the Board must abide by the Charter's rulemaking procedures, which include publishing notice of a hearing in one of the City's newspapers of general circulation, fairly conducting the hearing, and then publishing the rule in a City newspaper. (*Id.* at § 1-801.) Notwithstanding the rulemaking procedures, "if the Mayor or the City Council . . . declare in writing that an emergency requires the adoption of a specific rule, the proposed rule may be given immediate effect by the rulemaking authority." (*Id.* at § 1-801(H).) The Board must report to the Mayor and Council once a year concerning its activities. (*Id.* at § 6-101(B)(7).) "The reports shall include an accounting of the receipts and disbursements of all monies which have come into its hands and of any monies which may remain in its hands." (*Id.*)

The Charter talks specifically about the personnel employed by the Board to work at City-owned hospitals. The Board must appoint a Personnel Director, now referred to

as the Vice President of Human Resources, who serves at the Board's pleasure but is subject to confirmation by the Mayor. (*Id.* at § 6-202(C)); *List of Amendments to the Flint City Charter: August 6, 1996 to November 3, 2009* at 3, *available at* http://www.cityofflint.com/ clerk/ pdf/ city_charter_A.pdf. The Charter's provisions that deal with personnel apply to the Board, except where the Mayor or Council are mentioned, in which case the mayoral functions devolve upon the Board. (City of Flint Charter § 6-202(B)(2), Dkt. # 141-2.) The Board may hire work personnel but those employees are under the Civil Service Commission's (the "Commission's") jurisdiction. (*Id.* at § 6-202(B)(1).) The Commission is

> responsible for (1) enforcing the Merit Principle in all aspects of personnel administration in the City; (2) receiving, investigating and deciding disputes between the City and any of its employees in the Classified Service; (3) protecting City employees from political pressures; and (4) advising the chief personnel officer, Mayor, City Council and the Board of Hospital Managers concerning personnel administration.

(*Id.* at § 5-201(A).) The Commission "may advise the Mayor, Chief Personnel Officer, City Council, or Board of Hospital Managers as to any [personnel] policy it deems appropriate," and may "adjudicate disputes arising under the application of personnel policy." (*Id.* at 4-302(C).) Hurley's employees also pay into the City's Retirement System Fund. (Emergency Manager Report at 77, Dkt. # 152-3.)

While the City enjoys some control over Hurley, the critical inquiry is whether the City exercises "control of the fundamental aspects of the employment relationship that *gave rise to the claim.*" *Lyes*, 166 F.3d at 1345 (emphasis added). There is no evidence that the City exercises control over Hurley's day-to-day policies, such as work assignments, employment conditions, and performance expectations, from which

10

Plaintiff's lawsuit arose. Even though the City appoints managers to the Board, once appointed the Board has the "exclusive authority to manage and operate all City Hospitals and in so doing shall have such power as may be required for the faithful performance of its duties." (City of Flint Charter § 6-202(D), Dkt. # 141-2.) Hurley developed its own personnel policy that was not reviewed or approved by the City. (Hurley Medical Center Exempt Employee Handbook, Dkt. # 139-3.) Even though the Board must abide by the Charter, neither the Mayor or the Council have the authority to review or change the Board's decisions regarding work schedules, assignments, or whom the Board employs and terminates.

The City rejects the significance of the Commission, which was eliminated in December 2011. (Emergency Manager Order No. 6 at 2, Dkt. # 152-4.) The Charter explains that "[t]he Civil Service Commission shall have no authority to develop or define personnel policy." (City of Flint Charter § 4-302(C), Dkt. # 141-2.) While the Commission can "adjudicate disputes arising under the application of personnel policy," (*id.*), the Commission did not play any role in the alleged conduct that gave rise to Plaintiff's claims. Nor can Plaintiff provide any example of the Commission actually adjudicating disputes arising under the personnel policy. The Commission seemed theoretically capable of resolving employee grievances, but it appears to have rarely, if ever, exercised that power. Indeed, the City maintains that Hurley's Human Resources Department handles employee disputes without the City's assistance. Plaintiff indirectly disagrees with this assertion, arguing that Hurley's requirement to abide by the City's Charter, and the Commission's existence during Plaintiff's tenure with Hurley, makes

11

the City a necessary party to Hurley's total employment process. However, the City does not contest that it is not directly involved in resolving employee disputes.

The *Lyes* court considered an analogous situation. In that case, a plaintiff-employee sued for sex discrimination after her employer, a Community Redevelopment Agency ("CRA") for the City of Riviera Beach, did not hire her for an open position. *Lyes v. City of Riviera Beach, Fl.*, 166 F.3d 1332, 1335 (11th Cir. 1999). The court held that the CRA was distinct from the City of Riviera Beach because the CRA "retained and exercised control over the fundamental aspects of its employee relations." *Id.* at 1346. Among other reasons, the court emphasized that the CRA was responsible for hiring and terminating employees, establishing work schedules and assignments, and disciplining and terminating the plaintiff. *Id.*

Similar to the CRA in *Lyes*, the Board controls the fundamental aspects of Hurley's employee relations that gave rise to Plaintiff's claim. The Board has "exclusive authority to manage and operate" Hurley, (City of Flint Charter § 6-202(D), Dkt. # 141-2), and decides, without the City's supervision, work schedules, assignments, and employment conditions. Hurley disciplined and terminated Plaintiff without the City's involvement or approval. In considering the totality of the circumstances, therefore, Plaintiff has not proffered sufficient evidence to allow a reasonable fact finder to conclude that Plaintiff has clearly overcome the presumption that the City and Hurley are separate and distinct and should not be aggregated for Title VII purposes.

## IV.  CONCLUSION

Accordingly, IT IS ORDERED that Defendant City of Flint's renewed motion for summary judgment [Dkt. # 136] is GRANTED.

                                         s/Robert H. Cleland
                                         ROBERT H. CLELAND
                                         UNITED STATES DISTRICT JUDGE

Dated:  October 29, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, October 29, 2012, by electronic and/or ordinary mail.

                                         s/Lisa Wagner
                                         Case Manager and Deputy Clerk
                                         (313) 234-5522